## Case No. 9,203.

### The MARY CLINTON.

[Blatchf. Pr. Cas. 556; [1] Betts, Pr. Cas.]

Circuit Court, S. D. New York. Oct. 26, 1863.

PRIZE—BLOCKADE—ENEMY PROPERTY — NEUTRAL — LOYALTY OF OWNER OF PROPERTY USED IN ILLEGAL TRAFFIC — LIEN ON CAPTURED PROPERTY.

1. Objections taken, in the claims, to the sufficiency of the libel, in point of pleading, overruled.

2. The hostilities subsisting between the government and the rebels have the character and attributes of a public war, and the rules of national law applicable to wars of that description govern the rights and liabilities of persons whose property is captured, as prize of war, during such hostilities.

3. A lawful blockade had been imposed by the government, and put in force, at the time of the arrest of the vessel in this suit.

4. The property of persons domiciled or residing within the rebel states is a proper subject of capture on the sea as enemy property.

5. The proclamation of the blockade is, of itself. conclusive evidence that a state of war existed which demanded and authorized a recourse to a blockade, under the circumstances existing in the case.

6. Property devoted to illegal traffic becomes thus stamped as enemy property, and the quality of hostility does not depend exclusively upon the personal sentiments or lawful allegiance of the party, but arises often from its actual or business residence; so that the produce of the soil of the hostile country, engaged in the commerce of the hostile power. is legitimate prize without regard to the domicile of the owner.

7. A neutral friend to both belligerents cannot transport over the sea the effects of one to the use of the other. though also his friend. He is not allowed to aid and benefit the commerce of one belligerent to the prejudice of the other.

8. By investing his means, and participating in the trade and mercantile concerns of a belligerent nation, a neutral has, in effect. affixed to him the national character of the places at which he carries on his commerce.

9. The produce of the enemy's soil and country, owned by a neutral, while it remains in the enemy's country. particularly if obtained therein by a resident agent of the neutral merchant, has imparted to it the stamp of enemy property, and the owner is, pro hac vice, an enemy.

10. Vessel and cargo condemned for an attempt to violate the blockade and as enemy property.

[1] [Reported by Samuel H. Blatchford, Esq.]

11. The interest or expectancy of creditors in enemy property arrested as prize, even though amounting to a lien upon it, does not exempt it from capture as prize.

In admiralty.

BETTS, District Judge. The above vessel and cargo were captured May 29, 1861, by the United States vessel-of-war Powhatan, in the Gulf of Mexico, near one of the mouths of the Mississippi, steering towards the river, and bound to the port of New Orleans, and were brought into this port for adjudication as prize. A libel for that cause was filed in this court against the prize, July 3 thereafter. The vessel was laden at Charleston with a cargo of rice on the 12th of May, 1861, bound to the port of New Orleans. Several parties intervened, and interposed claims and defences in the cause. On the 23d of July aforesaid, Patrick Henry Ryan filed a claim as sole owner of the schooner, alleging that he was a citizen of the United States at the time the vessel sailed from Charleston. and so continued to the time of filing his claim. On the 13th of July aforesaid, the firm of Trenholm Brothers & Co. (of which firm one member resided in New York, one in Liverpool, and six in Charleston) filed their answer and claim in the cause. as agents of, and intervening for, John R. Armstrong, of Liverpool, and claimed that 102 tierces of rice, part of the cargo of the vessel, belonged solely and exclusively to the said John R. Armstrong. They deny, by their answer, the rightful capture of the vessel. They also, by their answer, except to the sufficiency of the libel, in not charging against the vessel or cargo any act committed in violation of law; and they further allege that the libel does not, on its face, show any cause whatsoever for the detention of the vessel or cargo, or charge the existence of war between the United States and the state of South Carolina, or the state of Louisiana, or between the said states themselves, or the existence of any blockade, or the legal notification thereof, if one was imposed in fact. On the 6th of July aforesaid, D. M. Fry & Co., of New York, filed a claim to the proceeds of 283 casks of rice, part of the cargo of the vessel, to be paid and accounted for to them by the consignee in New Orleans, towards payment of an indebtedness due to them by the shippers of the rice, in case the rice was delivered and sold in New Orleans; and they deny that the rice was subject to seizure, detention or forfeiture, by reason of any matters alleged in the libel, and they also submit exceptions to the libel for insufficiencies in its allegations: (1) That it does not appear that a state of war subsisted, whereby the goods were subject to seizure, detention, or condemnation as prize of war. (2) That it does not appear that, at the time of the seizure alleged in the libel, any blockade existed or was duly notified, by reason whereof the goods were liable to seizure or condemnation. On the 10th of July aforesaid, the firm of Sturges,

Bennet & Co., of New York, filed their claim in the suit, to 75 tierces of rice, part of the same cargo, alleging that J. A. Buchmeyer, in Charleston, South Carolina, shipped the said quantity of rice on the vessel, to be delivered at New Orleans to S. L. & E. L. Levy, consignee there, to be sold, with a view to operate as a remittance for the payment of debts owing by Buchmeyer to the claimants, his creditors; that, subsequently to that shipment, Buchmeyer transferred to the claimants the said rice, to be received and sold by them to the end aforesaid, and that, at the time, Buchmeyer was indebted to the claimants to an amount exceeding the value of the said rice; that, at all times, Buchmeyer and the claimants were citizens of the United States, the former residing at Charleston, and the latter in the city of New York; and the claimants deny that the rice is liable to seizure or condemnation. To this claim the same exceptions to the libel were annexed as to the one preceding. The firm of Grinnell, Minture & Co., of the city of New York, on the same day, July 10, filed a claim to 235 tierces and 3 half tierces of rice, part of the cargo seized in this suit on board the vessel. They allege that the aforesaid parcels of rice were shipped May 10, 1861, in the vessel, at Charleston, South Carolina, by Henry Cobea & Co., of the same place, consigned to S. L. & E. L. Levy, of New Orleans, and, at the time of shipment and capture, belonged to the said shippers; that, on the 20th of June, the said shippers transferred the said rice to Street & West, of Charleston; that, on the next day, Street & West transferred the rice to the claimants, to be received and sold by them on account of Street & West, and the proceeds to be applied to the payment of the amount owing by Street & West to the claimants, and they to hold the surplus for their account, which indebtedness to the claimants was $4,200 and upwards; and that, at all the times before mentioned, Henry Cobea & Co. and Street & West were each a commercial firm, doing business at Charleston, South Carolina, and the claimants were citizens of the United States doing business in the city of New York.

The above issues were noticed by the United States attorney for hearing at the present October term of the court, and the defaults of all the claimants, except John R. Armstrong, the claimant of 102 tierces of rice, were taken, they having failed to appear and make defence. The case has now been heard upon such defaults of the other claimants as against them, and on the contestation of the claimant Armstrong, and the argument of his counsel, in regard to his interest and defence in this suit. The objection sought to be raised through the claims, to the sufficiency of the libel in point of pleading has no foundation or support in the prize practice in the English or American courts. The Fortuna, 1 Dod. 81; Halleck, Int. Law, c. 31, § 32.

The judicial history of this case, patent upon the pleadings on file, and the concomitant action of the parties and the court in respect to the litigation involved in this suit, demonstrate that the points attempted to be brought into renewed discussion at this time were all definitely disposed of by the supreme court, in December term last, in the prize cases brought before that tribunal from various circuit courts of the United States. The Hiawatha, 2 Black [67 U. S.] 635. The main questions of law raised on this case were distinctly made upon the claims and answers filed by the several parties in the decision referred to, and are all resolved therein, against the defences. The bar interposed by those defences consisted of these cardinal positions: That the hostilities subsisting between the government and the rebels had not the character and attributes of a public war, and that, accordingly, the rules on national law applicable to wars of that description did not govern the rights or liabilities of the respective parties assailed in this suit; that a lawful blockade had not been imposed by this government and put in force at the time of the arrest of the vessel in this suit; and that the property of persons domiciled or residing within the rebel states was not a proper subject of capture on the sea as enemy property. But the judgment of the supreme court determines that the proclamation of the blockade is, of itself, conclusive evidence that a state of war existed which demanded and authorized a recourse to such a measure under the circumstances existing in the case; that property devoted to illegal traffic becomes thus stamped as enemy property; and that the quality of hostility does not depend exclusively upon the personal sentiments or lawful allegiance of the party, but arises often from his actual or business residence, so that the produce of the soil of the hostile country, engaged in the commerce of the hostile power, is legitimate prize, without regard to the domicile of the owner.

Ryan claims to be the owner of the vessel. Her register shows her ownership to be in New Orleans. The master testifies that he has no domicile, and that he resides with his vessel, and was born in Virginia. The mate knows no domicile of the master and his wife, except where his vessel is. The testimony shows that the vessel was laden at Charleston, and was despatched thence for New Orleans, in May, 1861. The vessel, on going out of the harbor of Charleston, was arrested and a warning was indorsed on her register by the United States boarding officer, not to enter any port in the Southern states. That indorsement, which is introduced in evidence before the court, is perfectly legible and intelligible in its terms and signature, and is in this form: "May 12, 1861, boarded and warned off the Southern coast by the U. S. S. Niagara, H. P. Dekrafft, Lt. U. S. navy." When the vessel arrived off the Mississippi she was seized by the United States ship-of-war Powhatan. The master testifies that he does not know for what she was arrested. The mate says it was for attempting to break the blockade.

It is very plain, from the statements of the master and mate, independently of the above notice, that they were well aware that New Orleans had been declared under blockade when the vessel directed her course there subsequent to her warning; and that, finding the proclamation fulfilled by a blockade efficiently enforced on her departure from Charleston, and her arrival at New Orleans, she repeated the violation of it, with full knowledge, and designedly. There is, accordingly, no room for doubt that the violation of the blockade at both ports was direct and intentional.

It appears, by the pleadings, that the cargo on board of the vessel was procured at Charleston, by residents domiciled there, who acted as agents for John R. Armstrong, who is represented to be the owner of the cargo, and to be a neutral, resident in Great Britain. It matters not that Armstrong has a co-partnership interest with his agents domiciled in the enemy's country, in the trade conducted in the products of that country with the enemy of the captors. A neutral friend to both belligerents cannot transport over the sea the effects of one to the use of the other, though also his friend. He is not allowed to aid and benefit the commerce of one belligerent to the prejudice of the other. By investing his means, and participating in the trade and mercantile concerns of a belligerent nation, a neutral has, in effect, affixed to him the national character of the places at which he carries on his commerce. Halleck, Int. Law, c. 29, §§ 26, 27; Upt. Mar. War. 124; The Dree Gebroeders, 4 C. Rob. Adm. 232. The produce of the enemy's soil and country, owned by a neutral, while it remains in the enemy's country, particularly if obtained therein by a resident agent of the neutral merchant, has imparted to it the stamp of enemy property, and the owner is, pro hac vice, an enemy. Sup. Ct. U. S. Decisions, note; Wheat. Int. Law (Lawrence's Ed.) Supp. p. 20; The Vigilantia, 1 C. Rob. Adm. 1.

The interest of the claimant Armstrong in the cargo procured by him in Charleston, and shipped on the voyage in question, falls within the principle, and is confiscable as enemy property. It is, also, directly so in consequence of its having been knowingly transported from an enemy port under blockade, and designed to be carried to another blockaded port, and being arrested in the effort to break the blockade of New Orleans. The knowledge of the master and his culpable purpose are established by the written warning indorsed on the register of his vessel, and are proved, against his denial on his examination in preparatorio, by that document, and also by the testimony of the first mate of the vessel, on the same examination. The fact of the blockade, both at the port of

the departure and the port of destination, at the time of the appearance of the vessel before those lines, and its efficiency, are demonstrated by the actual arrest of the vessel at each on its attempt to pass them.

The other claimants had no fixed property in the cargo captured. They had no higher interest than a privilege or lien, at the utmost, for the payment of pre-existing debts from the proceeds to be realized out of the various shipments of rice, on the sale thereof in New Orleans. It is clear, that the interest or expectancy of creditors, in enemy property arrested as prize, does not exempt it from capture as such, and, accordingly, the libellants are entitled to its condemnation and forfeiture. Wheat. Capt. c. 3, § 15; The Sally Magee [3 Wall. (70 U. S.) 451], in which C. M. Fry & Co. are also claimants in part, and where like points of law are considered by this court.

For the reasons above suggested, the vessel and cargo prosecuted in this suit are subject to condemnation and forfeiture.

An appeal was taken to the supreme court from this decree, as to a part of the cargo, but not as to the vessel. Affirmed by default February 27, 1866. [Case unreported.]